216 S.E.2d 236 (1975)
The COMMITTEE ON LEGAL ETHICS OF the WEST VIRGINIA STATE BAR
v.
Richard F. PENCE.
No. 13579.
Supreme Court of Appeals of West Virginia.
June 24, 1975.
*237 Campbell, Love, Woodroe & Kizer, David A. Faber, Charleston, for complainant.
Rudolph L. DiTrapano, Charleston, for defendant.
BERRY, Justice:
This is a proceeding for disciplinary action instituted by the Committee on Legal Ethics of the West Virginia State Bar, pursuant to the authority conferred by Part D, Article VI of the By-laws of the West Virginia State Bar. The respondent, Richard F. Pence, a licensed attorney and member of the West Virginia State Bar, was charged with professional misconduct by The Committee on Legal Ethics. The verified complaint of the Committee on Legal Ethics filed with this Court on March 24, 1975 charges that the defendant: (1) received in his professional capacity $30,000 belonging to his clients, Clarence R. Joachim and in Mr. Joachim's capacity as guardian for his infant son, Keith Joachim, and wrongfully commingled such funds with his own funds and those of his wife; (2) refused to pay over to his client on demand such funds as required by Code, 30-2-13, by Section 23, Part E, Article VI of the By-laws of the West Virginia State Bar and by the provisions of the Code of Professional Responsibility; (3) failed to pay over to his client such funds within six months of receipt thereof as required by the above cited provisions of the West Virginia Code and the By-laws of the West Virginia State Bar; (4) was without good and sufficient reason for failing to pay over such funds upon demand or within six months of receipt; and (5) deliberately falsified a bank deposit ticket and submitted it to the Committee as evidence in an attempt to defraud and mislead the Committee on Legal Ethics of the West Virginia State Bar.
The Committee on Legal Ethics conducted a formal hearing upon the charges against the respondent on December 2, 1974 and on February 3, 1975 a supplementary hearing was held. Subsequently, the Committee filed its complaint with this Court praying that this Court enter an order annulling the respondent's license to practice law. On March 25, 1975 this Court issued a rule directing the respondent to appear and show cause why his license to practice law should not be annulled. On May 13, 1975 the case was submitted for decision upon the briefs and oral arguments on behalf of the respective parties.
On February 5, 1971 Clarence Joachim and his wife, Anna, retained the respondent to prosecute a claim for a personal injury suffered by Keith Joachim, their son, as a result of an alleged medical malpractice on the part of Dr. D. R. Lantz of Parkersburg, West Virginia. The respondent took the case on a contingent fee basis whereby he was to receive one-fourth of any settlement or judgment on behalf of the child.
*238 On March 29, 1973 the respondent instituted suit against Dr. Lantz on the claim and was successful in negotiating a settlement with the Traveler's Company, the insurer of Dr. Lantz whereby $40,000 would be paid in settlement of the claim. After a summary proceeding on April 5, 1973 in the Circuit Court of Wood County, which resulted in an order confirming and approving the negotiated settlement, Mr. Joachim received a check from the Traveler's Company dated March 30, 1973 in the amount of $40,000 and made payable to "Clarence Joachim, Guardian for Keith Joachim and Richard F. Pence, his attorney". Respondent and Mr. Joachim endorsed the check and Mr. Joachim asked the respondent to retain Mr. Joachim's part of the proceeds until he returned from a trip to North Carolina. Respondent subsequently deposited the $40,000 check in his personal joint checking account with his wife. At the same time he made a cash withdrawal of $5,000. Respondent contended that he had $25,000 in cash on hand in his safe in his office and subsequently added the $5,000 which he withdrew from the bank to the $25,000 to make a total of $30,000 which was the amount Mr. Joachim was entitled to receive from the settlement. By April 16, 1973 the respondent and his wife had reduced the joint checking account to $12,210.75. Apparently, on April 5, 1973 when the respondent took control of the $40,000, Mr. Joachim signed a statement directing the respondent to hold the proceeds for him and to deliver "the same when and as directed".
Mr. Joachim testified that on approximately six occasions he demanded delivery of the $30,000 without success. The respondent denies Mr. Joachim's statement in this regard and testified that Mr. Joachim failed to appear at an appointment without explanation on one occasion and that on another occasion when the parties were to meet and settle the account the respondent was occupied outside the City of Parkersburg and advised Mr. Joachim to that effect so that another meeting could be arranged. However, it does appear that on February 6, 1974 the respondent delivered to Mr. Joachim a personal check in the amount of $3,305 drawn on the respondent's joint checking account.
Subsequent to a complaint by Mr. Joachim, Lawrence M. Ronning, Chairman of the District Three Grievance Committee of the West Virginia State Bar on June 26, 1974 made demand of the respondent that he deliver the balance of the $30,000 to Mr. Joachim by June 28, 1974. In response to a request by the respondent this time was later extended to July 1, 1974. Respondent did not deliver the money on or before July 1, 1974 and alleged in his answer that he was ready and willing to deliver the balance of the $30,000 at that time but that he had requested that Mr. Ronning deliver to him a receipt for the money or a release from Mr. Joachim concerning delivery of the money which was not done.
The Chairman of the Committee on Legal Ethics of the West Virginia State Bar informed the respondent by letters dated September 3, 1974 and October 15, 1974 of his duty to pay over on demand or within six months after receipt any funds held by him as attorney for Mr. Joachim. On September 19, 1974 Mr. Joachim retained Daniel A. Ruley, Jr. an attorney, to collect for him the funds held on his behalf by the respondent. Mr. Ruley, during the last week in September, 1974 telephoned the respondent and made demand that he pay over the funds to Mr. Joachim. The respondent contends that he told Mr. Ruley that he was ready and willing to pay over the money as soon as Mr. Ruley calculated the amount of interest due on the money held by him. Mr. Ruley testified that he made two or three other demands of the respondent to pay over the money without success.
On November 20, 1974 the respondent received a letter from Mr. Ruley stating the amount of principal due which he incorrectly calculated as being $27,700 and an additional amount for interest at the rate of six percent. On November 27, 1974 the respondent paid over to Mr. Ruley $27,700 in cash *239 which the respondent testified was the remaining sum of money which he had kept in an envelope in his safe for Mr. Joachim and a check for the amount of interest that was owing on the principal outstanding. Mr. Ruley immediately turned the money over to Mr. Joachim.
At the first hearing the respondent testified that on February 6, 1974 he had taken out $3,300 from the envelope in his safe and had deposited that amount of cash in his checking account from which he wrote the check to Mr. Joachim, individually, for $3,300, which was actually for $3,305. Members of the Committee at the first hearing asked the respondent to send in the deposit slip showing the $3,300 cash deposit to his checking account. The respondent subsequently submitted by letter to the Committee a copy of a deposit slip purporting to represent a deposit to his personal checking account of funds withdrawn from the safe covering his personal check. However, this copy of the deposit slip contained no markings showing that it had been processed by a bank. The respondent was next requested to furnish the original of the deposit slip and Mr. Pence subsequently sent in a purported original deposit slip but it too had no bank markings. The deposit slips showed an entry of $3,300 under currency and checks totaling $547.06 for a total deposit of $3,847.06. The Committee next formally notified the respondent that the Committee felt a supplementary hearing should be held on this matter. The respondent responded by letter stating that he had mistakenly furnished the Committee the wrong deposit slip and sent another deposit slip to the Committee which had the proper bank markings and showed an entry for checks totaling $547.06, but did not show a cash deposit of $3,300. The respondent's bank ledger cards were subpoenaed for the supplementary hearing and the ledger cards showed that no cash deposit of $3,300 was ever made during the period in question. The respondent stated in his answer that apparently a deposit slip was prepared by his secretary showing a $3,300 currency entry and a $547.06 total in checks but the deposit slip and the cash for some inexplicable reason were never sent in to the bank. However, the deposit slip was retained by the respondent's secretary, along with all other deposit slips in chronological order, and consequently, the respondent had mistakenly pulled a deposit slip from his records which had never actually been deposited and for which he offered no explanation other than the statement in his answer that his secretary for some unknown reason had failed to deposit the $3,300 cash in the bank.
The respondent testified that he made cash delivery of the remaining amount which was in his safe which, according to his testimony, should have been $30,000 less $3,300 or a total of $26,700. However, as mentioned previously, Mr. Ruley had miscalculated the remaining principal due which should have been $26,700 but he had mistakenly told respondent the sum was $27,700. The respondent delivered the sum of $27,700 which he stated was the entire remaining amount of cash in the envelope in his safe marked for Mr. Joachim. This over-payment of $1,077.88, including interest, was subsequently remitted to the respondent. The respondent declined to take the stand or to testify whatsoever at the supplementary hearing after his records were subpoenaed and entered into evidence showing that no cash deposit was made for $3,300. The Committee was of the opinion that the respondent's submission of the two deposit slips was an intentional attempt to deceive and mislead the Committee.
There were numerous affidavits submitted on behalf of the respondent by his peers in the legal profession in Wood County that the respondent was one of the outstanding trial lawyers in Wood County and was one of Wood County's most respected lawyers.
The proper handling of funds belonging to a client is one of the most important and exacting obligations of an attorney. The funds of a client and those of his attorney *240 should be kept entirely separate not only for the protection of the client but also to avoid the appearance of any improper handling of such funds and for these reasons commingling of funds is specifically disapproved by the Code of Professional Responsibility. Canon 9 EC 9-5. The identity of such funds should be carefully preserved and the procedure therefor is specifically provided in Canon 9 of the Code of Professional Responsibility, DR 9-102, in the following language:
(A) All funds of clients paid to a lawyer or law firm, other than advances for costs and expenses, shall be deposited in one or more identifiable bank accounts maintained in the state in which the law office is situated and no funds belonging to the lawyer or law firm shall be deposited therein except as follows:
(1) Funds reasonably sufficient to pay bank charges may be deposited therein.
(2) Funds belonging in part to a client and in part presently or potentially to the lawyer or law firm must be deposited therein, but the portion belonging to the lawyer or law firm may be withdrawn when due unless the right of the lawyer or law firm to receive it is disputed by the client, in which event the disputed portion shall not be withdrawn until the dispute is finally resolved.
The evidence in the case at bar indicates that the funds of the respondent's client were commingled with funds of the respondent. It was patently wrong to place the money in the respondent's personal account and the respondent's testimony itself indicates that the envelope in which he claimed he was keeping the client's money contained more than the $30,000 claimed by the respondent to be in the envelope. The client, Mr. Joachim, stated he thought the money was being kept in the bank, and when he was advised by the bank there was no such account, he began making demands of the respondent to return his money. In addition to the charge of commingling of funds belonging to his client, the respondent is charged with the serious offense of refusing to pay over on demand the funds in question to his client. This is not only a violation of the Code of Professional Responsibility, but is a violation of Code, 30-2-13. Moreover, Code, 30-2-14 provides that upon conviction of violating Code, 30-2-13, the attorney shall be disbarred.
DR 9-102 of the Code of Professional Responsibility provides that:
(B) A lawyer shall:
* * * * * *
(4) Promptly pay or deliver to the client as requested by a client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive.
Code, 30-2-13, provides that:
If any attorney receive money for his client as such attorney and fail to pay the same on demand, or within six months after receipt thereof, without good and sufficient reason for such failure, it may be recovered from him by suit or motion; and damages in lieu of interest, not exceeding fifteen percent per annum until paid, may be awarded against him, and he shall be deemed guilty of a misdemeanor and be fined not less than twenty nor more than five hundred dollars.
Code, 30-2-14, provides that:
Any attorney convicted under the next preceding section [§ 30-2-13] shall, in addition to the punishment therein prescribed, be disbarred from practicing as an attorney in any of the courts of this State, and the same shall be entered by the court as part of its judgment.
Section 23, Part E, Article VI of the By-laws of the West Virginia State Bar adopts and follows the provisions of Code, 30-2-13 and Code, 30-2-14. The evidence in the instant case shows beyond contradiction that the respondent did not pay over the funds in question to his client for more than eighteen months, despite the demands of his client, the Chairman of the State Bar's District Number Three Grievance Committee *241 to whom the matter had been reported by Mr. Joachim, The Chairman of the Committee on Legal Ethics of the State Bar, and an attorney whom Mr. Joachim had subsequently employed. The respondent stated that he had never refused to pay the funds in question to Mr. Joachim, and on one occasion had given him a check for $3,305. This payment apparently was for expenses and costs of Mr. Joachim in connection with the settlement of the malpractice action, which payment was not approved by the court.
The respondent testified that he took $3,300 out of the money kept in his safe for Mr. Joachim and deposited it to his account in the bank to cover the check for $3,305, leaving the exact amount of money due to his client in the envelope. The Committee asked him to furnish a deposit slip showing this deposit after the initial hearing. The deposit slip furnished by the respondent did not contain any markings showing it had been processed by the bank. He was then requested to furnish the original, but it also did not show any bank markings. After a second hearing the respondent furnished the slip for the deposit made, with markings by the bank, but it did not show the deposit of $3,300 in cash, as claimed to have been made by the respondent. The respondent did not testify at the second hearing after evidence was taken and records of the bank introduced as exhibits with regard to the deposit in question.
The evidence is clear and convincing that the respondent did not promptly pay over or deliver the funds in question to his client, Mr. Joachim, when requested on several occasions by Mr. Joachim and others. Code, 30-2-13, makes it a crime if an attorney fails to pay over on demand money received from a client, without good and sufficient reason, and Code, 30-2-14, provides that such attorney be disbarred from practicing law in any of the courts in this State. The fact that the respondent was not convicted of the violation of Code, 30-2-13, does not preclude disbarment. See Hall v. Eary, 114 W.Va. 82, 170 S.E. 904 (1933); State v. Hays, 64 W.Va. 45, 61 S.E. 355 (1908). Inasmuch as more than one year has elapsed since the demand for payment of the funds in question, the statute of limitations bars any prosecution of the respondent under the statute. State v. Locke, 73 W.Va. 713, 81 S.E. 401 (1914). The failure to pay over such funds held for a client, even in the absence of a statute such as the one in West Virginia, has been held to warrant disciplinary action. See Blum v. Tenth District Committee of Virginia State Bar, 210 Va. 5, 168 S.E.2d 121 (1969); People ex rel. Black v. Smith, 290 Ill. 241, 124 N.E. 807 (1919). It has also been held that the repayment of a client's funds will not prevent disciplinary proceedings against an attorney. In re Benedict, 254 S.C. 481, 175 S.E.2d 897 (1970).
All of the charges against the respondent are established by full, clear and preponderating evidence, which is the required proof to suspend or annul his license to practice law. In re Hendricks, W.Va., 185 S.E.2d 336 (1971); Committee on Legal Ethics of West Virginia State Bar v. Pietranton, 143 W.Va. 11, 99 S.E.2d 15 (1957); In re Marcum, 135 W.Va. 126, 62 S.E.2d 705 (1950). This principle is clearly set out in the syllabus of the Pietranton case as follows:
In a court proceeding prosecuted by the Committee on Legal Ethics of the West Virginia State Bar, for the purpose of having annulled the license of an attorney to practice law, the burden is on the committee to prove, by full, preponderating and clear evidence, the charge contained in the complaint filed on behalf of the committee.
The charges of commingling the funds of his client, the refusal to pay over the funds on demand, and the submission to the Committee of a misleading deposit slip, are established by sufficient proof. However, it appears from the record that the respondent has never had any other misconduct charges filed against him, and apparently *242 he has a good reputation in the community in which he has practiced law for a period of twenty-three years. Eighteen affidavits were filed in this proceeding on behalf of the respondent by outstanding citizens in the community and from his peers in the profession of law attesting to his good character and integrity. However, the affidavits are not entitled to great weight in a disciplinary proceeding. Committee on Legal Ethics of West Virginia State Bar v. Pietranton, supra. Although the prior good record of the respondent does not excuse the misconduct with which he is charged in this proceeding, it may be considered in mitigation with regard to the disposition of the case. The procedure followed in cases of this nature against attorneys at law is contained in Article VI, Part D, Section 20 of the By-laws of the West Virginia State Bar, and it provides in part as follows:
* * * Upon final submission of the case, the court shall consider the same and shall, by order entered of record, dismiss the complaint, administer a public reprimand to the attorney, suspend the attorney's license to practice law in this State for such period of time and upon such terms and conditions as may be adjudged by the court, annul the attorney's license to practice law in this State, or take such other action as the court in its judgment may consider proper, which order may include such provisions for reimbursement of the actual and necessary expenses incurred by the committee in connection with said case as the court shall deem just.
In considering all of the circumstances involved in the case presented here, we are of the opinion the disciplinary action to be taken in this case should be the suspension of the respondent's license to practice law for a period of one year. In addition to the suspension to practice law for a period of one year, the respondent shall reimburse the Committee on Legal Ethics of the West Virginia State Bar for its actual and necessary expenditures incurred in connection with this proceeding, and the order suspending his license to be entered in this proceeding shall provide for, and require, such reimbursement.
For the reasons stated herein, the license of Richard F. Pence to practice law in this State is suspended for a period of one year, and he is required to reimburse the Committee for all expenditures incurred by it in connection with this proceeding.
License suspended for one year.