321 S.E.2d 690

**The COMMITTEE ON LEGAL ETHICS OF the WEST VIRGINIA STATE BAR**

**v.**

**William M. WOODYARD, A Member Of The West Virginia State Bar.**

**No. 16239.**

Supreme Court of Appeals of West Virginia.

Oct. 17, 1984.

Robert H. Davis, Jr., West Virginia State Bar, Charleston, for complainant.

Don R. Sensabaugh, Jr., Charleston, for respondent.

PER CURIAM:

This is a disciplinary proceeding instituted by the Committee on Legal Ethics of the West Virginia State Bar against William M. Woodyard, a member of the Bar. The Committee has recommended that this Court suspend Mr. Woodyard's license to practice law for one year.

The verified complaint of the Committee filed with the Court on March 12, 1984 charges that Mr. Woodyard: (1) failed to pursue an action as he contracted to do, misrepresented his efforts to his client with regard to that action and failed to return unearned portions of his original fee, all in violation of Disciplinary Rules 6–101(A)(3) and 1–102(A)(4) of the Code of Professional Responsibility; and (2) requested funds with which to pay estate taxes and retained the same when in fact no taxes were due and owing, in violation of Disciplinary Rule 1–102(A)(3)(4).

The Committee on Legal Ethics conducted a hearing upon these charges against Mr. Woodyard on November 3, 1983. Subsequently, the Committee filed its complaint with this Court praying that we enter an order suspending Mr. Woodyard's license to practice law for one year. On March 13, 1984 this Court issued a rule directing Mr. Woodyard to appear and show cause why his license to practice law should not be suspended. On March 27, 1984 the case was submitted for decision upon the briefs filed and oral arguments made on behalf of the respective parties.

The evidence presented at the hearing held by the Legal Ethics Committee was as follows. Shortly after her husband's death on June 21, 1978, Dorothy Lambert (now Dorothy Lambert Elkins) retained Mr. Woodyard (respondent) to settle her husband's estate and handle certain property matters in which she was involved. Mrs. Elkins and the respondent also discussed the possibility of bringing a wrongful death action against her husband's employer, Chemetron Corporation. On September 20, 1978, Mrs. Elkins and the respondent entered into a written contract for respondent to investigate and pursue a wrongful death action. The fee agreed upon and paid was $4,000.[1] Both Mrs. Elkins and the respondent testified that the amount of the fee did not depend upon the outcome of the wrongful death action, *i.e.*, it was not a contingent fee arrangement. The respondent informed Mrs. Elkins, however, that lawyers ordinarily did work on a contingent fee basis in wrongful death actions, but he was declining to do so because her husband's case would be difficult to prove.

Prior to entering into the employment contract with Mrs. Elkins, the respondent received from the State Medical Examiner's office a copy of the autopsy report on James Lambert. The report revealed that the cause of death was arteriosclerotic cardiovascular disease. After receiving the report, the respondent telephoned the medical examiner to inquire whether chemicals used at Chemetron Corporation could have contributed to the cause of death. The medical examiner, Dr. Irvin Sopher, responded negatively to the respondent's question. The date of the respondent's telephone call to Dr. Sopher is not clear from the record but it appears that the call took place prior to September 20, 1978,

---

1. The contract stated:

This agreement entered into this 20th day of September, 1978, by and between William M. Woodyard and Dorothy Lambert, that for and in consideration of the mutual promises of the parties and for payment by Dorothy Lambert to William M. Woodyard in the amount of $4,000

William Woodyard hereby agrees to prosecute the claim of Mrs. Lambert and of her children to any and all claims arising out of the death of her dearly beloved husband, James Alvin. Entered into this 20th day of September, 1978, at Huntington, West Virginia.

when the respondent accepted his $4,000 fee.

The respondent testified that he conducted his own investigation to determine whether there was a cause of action arising from Mr. Lambert's death: he interviewed the personnel manager at Chemetron Corporation and attempted to gain access to the area of the plant where James Lambert was working at the time of his death; he requested a more detailed report from the medical examiner's office; he telephoned Dr. Sopher as previously noted; he reviewed a newspaper article that dealt with a chlorine gas leak at Chemetron Corporation; in January 1979 he discussed the case with a director of Chemetron Corporation whom he happened to meet in a social situation; and finally, the respondent discussed the case with a Huntington physician who informed him that he did not think the respondent would be able to prove that Mr. Lambert's death was caused by the chemicals with which he worked.

The respondent testified that by the summer of 1979 he had reached the conclusion that no cause of action existed for wrongful death but he did not inform Mrs. Elkins of his conclusion. By the summer of 1980, when the statute of limitations barred any possible action, the respondent again failed to so inform Mrs. Elkins.

In March of 1982 the respondent closed his office and left the State. In April he had a telephone conversation with Mrs. Elkins and an agreement was reached whereby the respondent would return to Mrs. Elkins $3,000 of his original fee. The respondent completed the installment payments to Mrs. Elkins in September of 1983.

The facts just stated are those pertinent to the first charge against the respondent, that he failed to pursue an action as he contracted to do and misrepresented his efforts with regard to that action to his client. The second charge brought against respondent, that he requested funds from his client to pay estate taxes when no taxes were due, stems from the following facts.

On December 15, 1980, the respondent obtained a check from Mrs. Elkins in the amount of $310. At this point her husband's estate was still not settled, and the respondent informed her that the money was to pay taxes on the estate. The respondent testified that he was in the process of closing his office and leaving the area when he asked Mrs. Elkins for the $310 check. He testified that he told Mrs. Elkins that the money was for any necessary fees and taxes due on the estate. If the amount owed was more than $310, the respondent would pay the difference; if it was less, he would keep the difference as part of his fee. The respondent further testified that at the time he received the $310 check from Mrs. Elkins, the final appraisal had not been filed and he did not know that there would be no fees or taxes connected with the estate; that as of 1980 the Lambert estate was the only estate he had settled by himself; that the purpose of obtaining the money from Mrs. Elkins before he knew how much was actually owed was to have the money available when it was needed; and, that it was not until 1982 that he learned that no estate taxes or fees were owed. The final appraisal and accounting were not prepared for the estate until 1982.[2]

Based upon the evidence at the hearing, the Committee concluded that the respondent was guilty of professional misconduct:

"By failing to pursue a wrongful death action as agreed, misrepresenting his work in that regard and failing to return unearned portions of the fee paid to pursue the action, Respondent violated DR 6–101(A)(3) and DR 1–102(A)(4).

"By requesting funds for payment of inheritance or estate taxes when none were due and owing, Respondent violated DR 1–102(A)(3), (4)."[3]

---

**2.** In addition to the above evidence, there was testimony at the hearing that the respondent had performed various other legal services for Mrs. Elkins. The Legal Ethics Committee found that the respondent had been adequately compensated for those services, however, and they are not at issue in the current proceeding.

**3.** Disciplinary Rule 6–101(A)(3) provides that a lawyer shall not "[n]eglect a legal matter entrusted to him."

The Committee specifically found that the respondent was clearly aware of the lack of a basis for any wrongful death action by September 20, 1978, yet he entered into a written agreement and accepted a $4,000 fee to pursue the action on that date.

■ "The Disciplinary Rules of the Code of Professional Responsibility state the minimum level of conduct below which no lawyer can fall without being subject to disciplinary action." *The Committee on Legal Ethics v. Tatterson,* 173 W.Va. 613, 319 S.E.2d 381 (1984). The standard of proof applied to attorney disciplinary proceedings to determine if a lawyer has fallen below the minimum standard was stated in Syllabus Point 1 of *Committee on Legal Ethics v. Lewis,* 156 W.Va. 809, 197 S.E.2d 312 (1973):

> "In a court proceeding prosecuted by the Committee on Legal Ethics of the West Virginia State Bar for the purpose of having suspended the license of an attorney to practice law for a designated period of time, the burden is on the Committee to prove by full, preponderating and clear evidence the charges contained in the complaint filed on behalf of the Committee."

*See also Committee on Legal Ethics v. Daniel,* 160 W.Va. 388, 235 S.E.2d 369 (1977); *Committee on Legal Ethics v. Pence,* W.Va., 216 S.E.2d 236 (1975); *Committee on Legal Ethics v. Pietranton,* 143 W.Va. 11, 99 S.E.2d 15 (1957).

■ The Committee has met its burden in the case before us and established by full, preponderating and clear evidence that the respondent failed to perform services for which he had been employed and obtained money from a client for estate taxes when no taxes were due.

■ We recognized in *Committee on Legal Ethics v. Pence, supra,* W.Va., 216 S.E.2d at 241, that "the repayment of a client's funds will not prevent disciplinary proceedings against an attorney." With regard to the severity of the recommended disciplinary action against an attorney,

"[t]his Court has refused to establish a uniform standard of disciplinary action and has stated that it will consider the facts and circumstances in each particular case in determining whether suspension or disbarment is indicated." *Committee on Legal Ethics v. Mullins,* 159 W.Va. 647, at 652, 226 S.E.2d 427, at 430 (1976).

In the case before us we are of the opinion that the Committee's recommendation that the respondent's license to practice law be suspended for one year is an appropriate recommendation under the circumstances.

Accordingly, we conclude that Mr. Woodyard's license to practice law should be suspended for a period of one year.

License Suspended for One Year.

---

DR 1–102(A)(4) states that a lawyer shall not "[e]ngage in conduct involving dishonesty, fraud, deceit, or misrepresentation."

DR 1–102(A)(3) provides that a lawyer shall not "[e]ngage in illegal conduct involving moral turpitude."